The **STATE OF NEVADA** ex rel. Hugh A. SHAMBERGER, State Engineer, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. 1247.

United States District Court
D. Nevada.
Aug. 27, 1958.

Harvey Dickerson, Atty. Gen. of Nevada, for plaintiff.

J. Lee Rankin, Asst. Atty. Gen., Howard W. Babcock, U. S. Atty., Reno, Nev., for defendant.

ROSS, District Judge.

The question here involved is whether or not the Federal Government must first secure permission of and from a state agency—here the State Engineer's Office—before it can make use of the ground or percolating water developed in its own wells, drilled at its own expense, upon its reserved lands constituting the Hawthorne Naval Ammunition Depot, situate about the Town of Hawthorne, Mineral County, Nevada. Or, to put the question another way, can the State of Nevada, at the instance of its State Engineer, enjoin the Federal Government from the use of the waters of its wells because of the fact that its officers, agents, and representatives failed and refused to comply with the statutory procedural law and regulation in force covering the field of appropriation and use of water.

Both on reason and, as we shall see in a moment, on authority, this Court is forced to the conclusion that there is no mandate in constitutional, statutory, or decisional law that compels the Federal Government to bend its knee to this type of state law and regulation, whether it be arbitrary or benign.

1. *The Stipulation of Facts.*

Greatly abridged, the stipulation of facts is as follows:

For the purpose of national defense, prior to 1935 the defendant established near Hawthorne, Mineral County, Nevada, a United States Naval Ammunition Depot, hereinafter the Depot, which at all times has been maintained by the Department of the Navy as a major installation in the program of that Department. It covers an area of more than 200,000 acres.

In 1848, by the Treaty of Guadalupe Hidalgo, Mexico, 9 Stat. 922, ceded to the defendant the lands included within the Depot. At all times since such cession by Mexico, full title to all such lands, except only a few isolated tracts, has resided in the defendant. After the admission of Nevada into the Union, those few isolated tracts passed into ownership by others, and title thereto was reacquired by the defendant from time to time after the establishment of the Depot. None of the wells hereinafter mentioned are situated upon land that was at one time owned by others, but each of them is located on land title to which has been in the defendant at all times since the cession by Mexico in 1848, supra.

The lands in question from time to time before February 4, 1935, were withdrawn by executive order, under Congressional authority, from settlement, location, sale, entry, and all forms of appropriation, for the exclusive use and benefit of the United States Navy, for the development of, and use in connection with, the Depot. The first of such executive orders was dated October 27, 1926, and the last was dated February 4, 1935. At all times since the dates of the respective withdrawal orders, the lands covered thereby have been held and

administered by the defendant as essential parts of the Depot.

By the Act of March 21, 1864 (13 Stat. 30; Nevada Compiled Laws, 1929, Sections 1, 4, 5, 11), entitled "An Act to enable the People of Nevada to form a Constitution and State Government, and for the Admission of such State into the Union on an equal Footing with the original States," the Congress provided for the admission of Nevada into the Union and prescribed certain terms and conditions with respect thereto. The act provided in part as follows:

"Sec. 4.

   *    *    *    *    *    *

"Third. That the people inhabiting said territory do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within said territory, and that the same shall be and remain at the sole and entire disposition of the United States;
* * *

"Sec. 5. * * *; whereupon it shall be the duty of the President of the United States to issue his proclamation declaring the State admitted into the Union on an equal footing with the original states, without any further action whatever on the part of congress."

The Constitutional convention provided for in the Enabling Act did, as part of the Constitution of Nevada adopted on July 28, 1864, enact the ordinance required by Section 4 of the Enabling Act, providing in part as follows:

"§ 3. * * *

"Third. That the people inhabiting said Territory do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within said Territory, and that the same shall be and remain at the sole and entire disposition of the United States;
* * *". Nevada Compiled Laws, 1929, Sections 18, 19, 20.

By an act of its legislature approved March 28, 1935 (Chapter 144, Statutes of Nevada, 1935), Nevada ceded to the defendant exclusive jurisdiction "upon and over the land and within the premises" of the Depot, subject only to the reservations therein made. The full text of the Act is as follows:

"An Act ceding to the federal government jurisdiction over the land and within the premises of certain federal buildings at or near Hawthorne, in Mineral County, Nevada, commonly known as the 'U.S.N. Ammunition Depot.'

"(Approved March 28, 1935)

"*The People of the State of Nevada, represented in Senate and Assembly, do enact as follows:*

"Section 1. The State of Nevada, except as hereinafter reserved and provided, hereby cedes jurisdiction to the United States upon and over the land and within the premises of that certain area situated near Hawthorne, Nevada, in Mineral County, commonly known as the 'U. S. N. Ammunition Depot,' comprising all of that certain area now occupied by the federal government in connection with said plant, or to be hereafter acquired or annexed thereto, or to be used in connection therewith, including all the buildings and improvements thereon.

"Sec. 2. It is hereby reserved and provided by the State of Nevada that any private property upon said lands or premises shall be subject to taxation by the state, or any subdivision thereof having the right to levy and collect such taxes, but any property upon or within such premises which belongs to the government of the United States shall be free of taxation by the state, the county of Mineral, or any of its subdivisions.

"Sec. 3. The State of Nevada reserves the right to serve or cause to be served, by any of its proper officers, any criminal or civil process upon such land or within such premises for any cause there or elsewhere

in the state arising, where such cause comes properly under the jurisdiction of the laws of this state or any subdivision thereof.

"Sec. 4. This act shall be in full force and effect from and after its passage and approval."

The cession of jurisdiction thereby made has at all times since March 28, 1935, been and it now is in full force and effect.

Beginning on or about February 15, 1942, and from time to time thereafter to and including on or about September 15, 1945, the defendant drilled and put into operation certain wells within the boundaries of the depot in order to provide a water supply for beneficial uses necessary to accomplishment of the purposes of said depot. These wells were designated as U. S. Navy Wells Numbers 1, 2, 3, 4, 5 and 6. The waters tapped and developed thereby were and are percolating waters.

The area wherein such wells are situated has not been designated by the State Engineer as a basin or sub-basin, as provided in Section 4 of Chapter 178, Statutes of Nevada, 1939, as amended, nor is the area a proved artesian basin. The development and operation of the wells does not interfere, and has at no time interfered, with anyone's vested right.

Although the wells were constructed and theretofore operated by the defendant without regard to Nevada statutes relating to the appropriation and use of underground waters, on or about July 29, 1949, the commanding officer of the Depot filed in the office of the State Engineer an application for permit to appropriate to beneficial use the waters of each of those wells.

On or about September 26, 1949, a corrected application was similarly filed with respect to each well. On or about January 9, 1950, the State Engineer approved and granted each of the applications.

On or about June 5, 1950, the commanding officer of the Depot filed in the office of the State Engineer with respect to each well "Proof of Commencement of Work" and "Proof of Completion of Work."

Notwithstanding the work essential to the actual diversion of water from each well was completed long prior to the filing of the applications with the State Engineer on July 29, 1949, supra, and notwithstanding the defendant had in fact been diverting water from each well and applying it to beneficial use for the purposes of the Depot since the respective dates of completion of the work, the Depot's commanding officer on or about September 18, 1952, filed in the office of the State Engineer an application for an extension of time of one year within which to file proof of beneficial use with respect to Navy Well No. 1.

On or about December 11, 1953, and on or about July 27, 1954, similar applications, each for an additional extension of time of one year to make proof of beneficial use, were similarly filed. Like applications for extension of time to file proof of beneficial use were filed at the same times with respect to each of the other wells. Each of these applications were granted by the State Engineer.

Proofs of application to beneficial use of the waters of the wells were not filed by July 27, 1955, and the State Engineer notified the commanding officer of the Depot by registered mail that unless such proofs or application for extension of time were filed within 30 days from receipt of the notice, the permits granted upon the original applications would be cancelled.

In a letter dated July 25, 1955, the commanding officer advised the State Engineer that "the applications for water rights with regard to the wells are being dropped and no continuing action is expected. This action is a result of instructions from the Commandant, Twelfth Naval District, who in turn based his decision on a recent rule of the U. S. Supreme Court (Federal Power Commission v. [State of] Oregon, 1955,

349 U.S. 435 [75 S.Ct. 832, 99 L.Ed. 1215], infra)."

On September 7, 1955, the State Engineer entered and served on the Commanding Officer of the Depot an order entitled "In the Matter of Permits to Appropriate Water, Serial Numbers 12988 to 12993, inclusive, in name of U. S. of America, U. S. Naval Ammunition Depot, Hawthorne, Nevada." By the terms thereof, the State Engineer cancelled as of August 28, 1955, the above-mentioned permits. The order further provided as follows:

> "It is hereby the Order of the state engineer that unless steps be taken with thirty (30) days from the date of this Order to reinstate said permits, either by filing proofs of beneficial use or filing applications for extension of time within which to file said proofs, that the use of water from said wells cease."

Neither the defendant nor any officer or representative thereof has reinstated or endeavored to reinstate any of the permits referred to in the State Engineer's order.

## 2. The Issue.

The Complaint seeks a declaratory judgment determining the plaintiff's "rights, status, and legal relations under its laws pertaining to the appropriation to beneficial use of the underground waters of (Nevada) by (the defendant) and its government."

The above preamble of the complaint, however, unduly limits the issue by restricting the determination of the plaintiff's rights to one solely under the plaintiff's own laws. There are other legal principles to be considered, besides those embodied in the Constitution, the statutes, and the judicial decisions of the State of Nevada.

■ In 43 U.S.C.A. § 666, the United States gave its consent to be joined as a defendant "in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights,

where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law," etc. The same statute recites that the United States "shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty."

This does not mean, however, that the United States cannot invoke *Federal* statutes and decisions in support of its claim that it need not obtain a permit from the State to use underground waters in a naval installation. This Court does not believe that the defendant stultified itself by giving its case away in advance: All laws, both State and Federal, are to be considered in this case, insofar as they are relevant.

Indeed, the defendant is not here impugning the authority of the laws of Nevada. On the contrary, it bottoms some of its case upon a Nevada statute; namely, Chapter 144 of the Statutes of Nevada, 1935, supra, which ceded jurisdiction to the defendant "upon and over the land and within the premises of that certain area situated near Hawthorne, Nevada," etc. In view of the stipulation, supra, that "full title" to the land in question has been in the defendant at all times since its cession by Mexico in 1848, reliance on Nevada's cession is unnecessary.

And Chapter 178 of the Statutes of Nevada of 1939, enacted four years after the defendant acquired the Hawthorne tract from the State, recognized "existing rights." The very first section of that Act provides in part as follows:

> "All underground waters of the boundaries of the state belong to the public, and subject to all existing rights to the use thereof, are subject to appropriation for beneficial use only under the laws of the state," etc.

Accordingly, it cannot be said that the defendant is pleading that relevant "State laws are inapplicable."

### 3. *McCulloch v. Maryland.*

Since the earliest reaches of American Constitutional history, the courts have stressed the supremacy of the Federal government in matters coming within the restricted scope of its delegated functions. During the period of our judicial history decision after decision has emphasized the paramount power of the national government within its prescribed area.

In McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 4 L.Ed. 579,[1] the leading case dealing with the supremacy of Federal law in matters of Federal concern, Mr. Chief Justice Marshall laid down certain principles that this Court considers controlling here. He said:

"The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any State to the contrary notwithstanding'." 4 Wheat. at page 406.

Marshall stressed the independence of the Federal Government from the necessity of relying upon a State's control or permission as to matters falling within the national ambit. The Chief Justice asserted:

"No trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the States, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution." 4 Wheat. at page 424.

Developing his subject from the question of independence to that of supremacy, Marshall continued:

"This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them." 4 Wheat. at page 426.

Referring to the American system of government, the Chief Justice continued:

"The sovereignty of a State extends to every thing which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single State. They are given to the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single State cannot confer a sovereignty which will extend over them." 4 Wheat. at page 429.

In its reply brief, the plaintiff here points out that the State Engineer of Nevada "granted" the naval officers three years' time to study further the question of water availability before completing the requirement of filing proofs of beneficial use. The brief closes this section of the argument with this rhetorical question:

"Does such fact show any disposition on the part of the State

---

1. For a penetrating, though perhaps debatable, critique of McCulloch, see "McCulloch v. Maryland: Right Principle, Wrong Case," by Harold J. Plous and

Gordon E. Baker, Stanford Law Review, July, 1957, Volume 9, Number 4, Pages 710–730.

and/or its officers to deny use of water to the United States or even to interfere in any manner with such use?"

In other words, the plaintiff here admonishes us to have confidence in the reasonableness, forbearance, and even generosity of the State.

It was precisely to this type of argument, addressed to "confidence", that the Chief Justice replied in McCulloch:

"* * * that there is a plain repugnance, in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control (is a proposition) not to be denied. But all inconsistencies are to be reconciled by the magic of the word *confidence* * * *.[2]

"But is this a case of confidence? Would the people of any one State trust those of another with a power to control the most insignificant operations of their State government? We know they would not. Why, then, should we suppose that the people of any one State should be willing to trust those of another with a power to control the operations of a government to which they have confided their most important and most valuable interests? In the legislature of the Union alone, are all represented. The legislature of the Union alone, therefore, can be trusted by the people with the power of controlling measures which concern all, in the confidence that it will not be abused. This, then, is not a case of confidence, and we must consider it as it really is. * * *

"This was not intended by the American people. They did not de-

sign to make their government depend on the States." 4 Wheat. at pages 431, 432.

Chief Justice Marshall closed his opinion with the following comment:

"The Court has bestowed on this subject its most deliberate consideration. The result is that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared." 4 Wheat. at page 436.

This Court believes that the principles underlying McCulloch, if correctly applied, could dispose of the instant controversy. But it is not necessary to rely upon this judicial landmark alone. Several modern decisions likewise point the way.

### 4. *The So-Called Pelton Dam Case.*

So far as we have been considering the general paramountcy of Federal control over matters that were primarily of Federal concern. Let us now advert to the struggle between the Federal government and the various States over the commodity with which in this case we are exclusively concerned—water.[3]

Enunciating principles that are peculiarly applicable to the case at bar, the decision in Federal Power Commission v. State of Oregon, 1955, 349 U.S. 435, 443, 444, 448, 75 S.Ct. 832, 838, 99 L.Ed. 1215, the so-called Pelton Dam case, is particularly helpful.

In that case, a public utility had applied to the Federal Power Commission for a license to construct Pelton Dam on

---

2. The emphasis is that of Mr. Chief Justice Marshall.

3. For a rapid survey of the historic *interstate* struggle over water, see "Streams of Strife", Rocky Mountain

Law Review, December, 1936, Volume 9, Number 1, Pages 21–35, in which, inter alia, the Colorado River controversy is discussed.

the Deschutes River, in Oregon, under the Federal Power Act, 16 U.S.C.A. § 791a et seq. The dam would prevent the migration of "anadromous" fish— fish ascending rivers from the sea for breeding purposes.

Because of the interference with this migration, the applicant could not obtain a permit from the appropriate state authorities.

The Supreme Court held that the Federal Power Commission must be sustained in granting a license, notwithstanding the disapproval of the State, because the termini of the dam were to be situated on "reserved" lands of the United States.

At the outset, the Court carefully distinguished between the terms "reservations" and "public lands", as used in the Federal Power Act. Said Mr. Justice Burton:

"'Public lands' are lands subject to private appropriation and disposal under public land laws. 'Reservations' are not so subject. The title to the lands upon which the eastern terminus of the dam is to rest has been in the United States since the cession by Great Britain of the area now comprising the State of Oregon. Even if formerly they may have been open to private appropriation as 'public lands,' they were withdrawn from such availability before any vested interests conflicting with the Pelton Project were acquired. Title to the bed of the Deschutes River is also in the United States. Since the Indian Treaty of 1855, the lands within the Indian reservation, upon which the western end of the dam will rest, have been reserved for the use of the Indians. More recently, they were reserved for power purposes and the Indians have given their consent to the project before us."

Under the Federal Power Act, 16 U.S.C.A. § 796, the term "'reservations' means national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purpose; but shall not include national monuments or national parks."

It can scarcely be denied that under the above definition, though it is found in the Federal Power Act, the Depot here under consideration must be regarded as a naval "reservation." Indeed, as we have seen, the stipulation of facts sets forth that the lands in question have been "withdrawn" from "all forms of appropriation, for the exclusive use and benefit of the United States Navy," etc., and that the people of Nevada "forever disclaim all right and title to the unappropriated public lands lying within said territory," etc.

Nor can the plaintiff here gather consolation from the fact that in the stipulation before us, only the word "withdrawn" is used in connection with the setting aside of the Depot in question for naval use. In the Pelton Dam case, the Federal Power Act used the words "withdrawn, reserved, or withheld from private appropriation," etc.

Developing further the distinction between "public" and "reserved" lands, the Supreme Court, in the Pelton Dam decision, continued:

"The Desert Land Act (43 U.S.C.A. § 321 et seq.) severed, for purposes of private acquisition, soil and water rights on public lands, and provided that such water rights were to be acquired in the manner provided by the law of the State of location. (Cases cited.)

"It is not necessary for us, in the instant case, to pass upon the question whether this legislation constitutes the express delegation or conveyance of power that is claimed by the State, *because these Acts are*

*not applicable to the reserved lands and waters here involved.* The Desert Land Act covers 'sources of water supply upon the public lands * * *." The lands before us are not 'public lands' but 'reservations.' Even without that express restriction of the Desert Land Act to sources of water supply on public lands, these Acts would not apply to reserved lands. 'It is a familiar principle of public land law that statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose.' (Cases cited.) The instant lands certainly 'are not unqualifiedly subject to sale and disposition * * *.' Accordingly, it is enough, for the instant case, to recognize that these Acts do not apply to this license, which relates only to the use of waters on reservations of the United States." (Emphasis supplied by the Supreme Court.)

The brief of the Amici Curiae comments thus upon the foregoing excerpt from the Pelton Dam case, which is palpably damaging to their argument that certain earlier cases, "taken together, constitute an unequivocal holding that the Desert Land Act has transferred sovereign authority over water within their boundaries to the states," etc.:

"From the material that we have just reviewed, it must be at once apparent that this pronouncement was not necessary to the decision of the case and, therefore, that it constituted dictum. All that was necessary to the sustaining of the license was the recognition that under the authority of the *First Iowa* line of cases, the Federal Power Act had superseded the inconsistent provisions of Oregon's law relating to fish protection * * *. A dictum,

even a Supreme Court dictum, is not controlling on another court."

This Court does not agree. A well considered expression by the Supreme Court of the United States is not to be thus brushed aside.

In the first place, the foregoing excerpt from Pelton is not dictum. It was necessary for the decision of that case for the Court to determine that the Acts of July 26, 1866, of July 9, 1870, and the Desert Land Act of 1877 did not apply to the license before it, because counsel in that case argued that those "Acts preclude or restrict the scope of the jurisdiction, otherwise apparent on the face of the Federal Power Act, and require the consent of the State to a project such as the one before us." 349 U.S. at page 447, 75 S.Ct. at page 840. In view of such an argument by counsel, it is difficult to see how it can be urged here that the Supreme Court's discussion of the limited reach of the Desert Land Act and cognate statutes was a mere *dictum.* This Court is not disturbed by this type of argument.

In the second place, assuming, solely for the purpose of the argument, that this significant statement by the Supreme Court of the United States is a dictum, it should be borne in mind that it is a dictum by the highest Court of the land —an expression of how that tribunal would rule if a controversy precisely on all fours with the case now before this Court were to be presented to the Supreme Court for decision.

At worst, the Pelton Dam case is highly persuasive authority in the instant case. At best, it is determinative. This Court is inclined to the latter view.

### 5. The "Ivanhoe" Irrigation District Cases.

On June 23, 1958, the Supreme Court decided four cases that presented what it characterized as "issues of basic importance to the federal reclamation laws." In the course of its opinion, the Court used language extremely appropriate here. The cases may be cited under the

title Ivanhoe Irrigation District v. Mc-Cracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313.

The Supreme Court of California had refused to confirm certain contracts entered into between two state irrigation districts and a water agency on the one hand, and the United States on the other, finding the contracts invalid on several grounds. Ivanhoe Irrigation District v. All Parties and Persons, 47 Cal. 2d 597, 306 P.2d 824. Specifically involved were sections of the Federal Reclamation Act of 1902, 43 U.S.C.A. § 372 et seq. and the Federal Reclamation Project Act of 1939, 43 U.S.C.A. § 387, the provisions of which do not concern us here. Significant, however, is the following language in the opinion:

"In developing these projects the United States is expending federal funds and acquiring federal property for a valid public and national purpose, the promotion of agriculture. This power flows not only from the General Welfare Clause of Art. I, § 8, of the Constitution, but also from Art. IV, § 3, relating to the management and disposal of federal property. As this Court said in United States v. City and County of San Francisco, 1940, 310 U.S. 16, 29–30, 60 S.Ct. 749, 756, 84 L.Ed. 1050, this 'power over the public land thus entrusted to Congress is without limitations. "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine." ' (Cases cited.)

"Also beyond challenge is the power of the Federal Government to impose reasonable conditions on the use of federal funds, federal property, and federal privileges. (Cases cited.) The lesson of these cases is that the Federal Government may establish and impose reasonable conditions relevant to federal interest in the project and to the overall objectives thereof. Conversely, a State

cannot compel use of federal property on terms other than those prescribed or authorized by Congress. Public Utilities Comm. of State of California v. United States, 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed. 2d 470.[4] Article VI of the Constitution, of course, forbids state encroachment on the supremacy of federal legislative action." 78 S.Ct. at pages 1185–1186.

In the instant case, too, this Court holds that the State of Nevada cannot claim rights in the Depot property "on terms other than those prescribed or authorized by Congress." And since no such terms have been "prescribed or authorized by Congress," the State has no such rights.

### 6. *National Defense Aspect.*

Up to this point, there has been discussed merely from a strictly civilian aspect Nevada's attempted interference with United States control over the underground waters of the Depot.

There is another aspect to the problem. That aspect is one related to the national defense. A recent three judge case decided in this circuit, and affirmed by the Supreme Court has met that issue fairly and squarely. The case is United States v. Public Utilities Commission of California, D.C.Cal.1956, 141 F.Supp. 168, affirmed 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470.

The controversy there arose over the constitutionality of Section 530 of the California Public Utilities Code, Cal.Stat. 1955, c. 1966, which provided that the state Commission might *"permit* common carriers to transport property *at reduced rates for the United States,* state, county, or municipal governments, to such extent and subject to such conditions as it may consider just and reasonable."

The three judge court in that case, which like McCulloch, is not mentioned in the final briefs filed here, was presided over by the late Judge Dal M. Lem-

4. The Public Utilities Commission case referred to by the Supreme Court is dis-

cussed in the next succeeding section of the present opinion.

mon, of the United States Court of Appeals for the Ninth Circuit, who also wrote the opinion.

"It is well settled," Judge Lemmon said, "that a state statute which places an unreasonable burden upon the discharge of a Federal function is unconstitutional." 141 F.Supp. at page 187.

After quoting the statement in McCulloch that "It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments as to exempt its own operations from their own influence," (at page 188) Judge Lemmon concluded his opinion in the following language:

"In a dictatorship, the warlords do not even *demand*—much less *request*—authority to negotiate with private parties for the supply of their war needs. Autocrats *take* what they want!

"It is therefore a heartening spectacle, in a Constitutional democracy, to see a group of military men, speaking for the sovereign itself, appear in a civil court to *plead* to be allowed to carry out their Constitutional functions by being permitted to contract freely with privately owned carriers to supply the Government's transportation needs.

"But this very subordination of the military to the civil power—fundamental in every true democracy—itself imposes a grave responsibility upon civil courts. We dare not, in good conscience and under the Constitution of the United States, deny relief to such a suitor when it proves to our satisfaction that such denial would hamper the national defense.

"Such proof the present plaintiff has produced in abundance. We do not believe that a federal court, after listening to such testimony and dispassionately reviewing the record, as we have done, can or should stay its hand when legiti-

mate relief is requested by the armed forces of the nation.

"Accordingly, we hold that, insofar as Sec. 530, supra, purports to authorize the Public Utilities Commission of California to impose 'such conditions as it may consider just and reasonable' upon the granting of reduced rates by commercial carriers in favor of the plaintiff, it is invalid, void, and of no effect, as contravening the provisions of the United States Constitution relating to the national defense, supra. The defendant is permanently enjoined from enforcing any of the restrictive provisions of Sec. 530 as against the plaintiff." At page 190. (Emphasis is Judge Lemmon's.)

In affirming the judgment of the three judge tribunal, the Supreme Court said:

"The question is whether the United States can be subjected to the discretionary authority of a state agency for the terms on which, by grace, it can make arrangements for services to be rendered it. * * *

"The United States wants to be rid of the system that subjects its procurement services to that form of state supervision * * *." 355 U.S. at pages 539, 540, 78 S.Ct. at page 451.

In the case now before this Court, the question is not merely "whether the United States can be subjected to the discretionary authority of a state agency for the terms on which, by grace, it can make arrangements for services to be rendered it." Here it is sought to compel the United States to obtain permits to use water from wells that the United States *itself* has dug (Stip. VII), on property to which it has had *"full title"* at all times since the cession of the land by Mexico in 1848. (Stip. III.) In the instant case, the United States is not seeking freedom to arrange for services to be performed for it by others. It is merely insisting that it has the right

to perform its own services on its own land and use the water obtained by means of such services, without being compelled to seek a permit from the State "to appropriate to beneficial use the waters of each of said wells." (Stip. VIII.)

In its affirmance of the judgment in the three judge case, the Supreme Court observed that there, as here, "the State places a prohibition on the Federal Government", and quoted the following language by Chief Justice Marshall, supra, 4 Wheat. at page 427:

> "It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence."

It was to any army general, however, that the Supreme Court accorded the last word. The high court's opinion closes with the following warning by General Edmond C. R. Lasher, Assistant Chief of Transportation, who testified at the trial:

> " * * * for us to make these arrangements at the Washington level with the various states, let us say 48 states, with 48 varieties of methods to follow, we would find ourselves in an administrative morass out of which we would never fight our way, we would never win the war." 355 U.S. at page 546, 78 S.Ct. at page 454.

### 7. *Conclusion.*

This Court, too, may well close its opinion with General Lasher's grim admonition.

In these troubled days, particularly, a court should hesitate to impede the lawful and logical functions of the Department of the Navy, exercised in what it has been stipulated is "a major installation in the program of that Department for the defense of the Nation." (Stip. 1.)

Accordingly, the complaint is dismissed, and the defendant is awarded its costs.

Counsel for defendant are directed to prepare and lodge with the Court findings of fact and conclusions of law, and form of judgment which when adopted and filed will constitute the findings, conclusions and judgment of this Court.